# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

      Plaintiff,

vs.

      **Case No. 1:15-cr-3762-JCH**

**MOHAMMAD MANASRA**,

      Defendant.

## UNITED STATES' RESPONSE TO DEFENDANT MOHAMMAD MANASRA'S SENTENCING MEMORANDUM (DOC. 112)

The United States files this sentencing memorandum in response to the "Sentencing Memorandum on Behalf of Mohammad Manasra," Doc. 111, and in support of a time-served sentence, followed by 12 months of supervised release.

On October 5, 2017, Manasra pleaded guilty for fraudulently selling, offering, and displaying imported jewelry as genuine Native American jewelry, pursuant to a one-count, misdemeanor Information in violation of U.S.C. § 1159. The United States requests a time-served sentence in Manasra's case based on his cooperation with the government, his multiple debriefs, his willingness to testify, his relative sophistication and his minor position in the hierarchy uncovered during the investigation of this case.

### I.        Background of the Indian Arts and Crafts Act

On August 27, 1935, Congress created the Indian Arts and Crafts Board (IACB) to improve the economic status of Native Americans through the development and promotion of authentic Native American arts and crafts. 49 Stat. 891; 25 U.S.C. §§ 1158-1159. The 1935 Act adopted criminal penalties for selling items misrepresented as Native American made. This provision, which set fines not to exceed $500 or imprisonment not to exceed six months, or both, proved to be ineffective at stemming the flood of counterfeit Native American arts and crafts in

the market.

In response to growing sales of counterfeit Native American arts and crafts that negatively impact the sale of authentic Native American products, Congress passed the Indian Arts and Crafts Act (IACA) of 1990, P.L. 101-644 (Act). Today, these counterfeits include a glut of overseas knock-offs and severely undercut Native American economies, self-determination, cultural heritage, and the future of an original American treasure. The IACA is designed as a truth-in-advertising law meant to punish individuals who falsely market products as "Indian Made" when the products are not, in fact, made by Indians as defined by the Act.  The relevant criminal portion of the Act reads as follows:

(a) It is unlawful to offer or display for sale or sell any good, with or without a Government trademark, in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization, resident within the United States.

Subsequently, the Indian Arts and Crafts Amendments Act of 2010, P.L. 111-211, allowed the IACB to refer cases to any federal law enforcement officer for investigation. In response to the scourge of counterfeit Native American arts and craft products, IACB entered into a Memorandum of Agreement with the United States Fish and Wildlife, Office of Law Enforcement in 2012 to develop an investigative unit to pursue violations of IACA.

### II.      *Background of the Investigation*

As part of the Memorandum of Agreement between USFWS and the IACB, in April of 2012, Special Agent Russell Stanford initiated an investigation into the importation and subsequent sale of Native American-style jewelry in violation of 18 U.S.C. §1159(a). The following are SA Stanford's findings with respect to Sterling Islands, Inc. ("Sterling").

Sterling, is an Albuquerque-based import company that was originally registered as a Virginia corporation. Sterling purchased jewelry from its sister manufacturer corporation in the Philippines, Fashion Accessories 4 U, Inc. ("FA4U"), owned and operated by the same family as Sterling and registered with the Philippines Securities and Exchange Commission. From approximately 2010 until late 2015, Sterling declared to USFWS, upon importation from FA4U, 298 shipments of jewelry with a total declared value of approximately $11.8 million in imported jewelry. An examination of Sterling's financial records over nearly the same time period revealed **$6,355,599.89** in payments from Sterling to FA4U from June 18, 2010 to July 17, 2014.

2

The payments were made by international wire transfer drawn on a Sterling account with Bank of America to the FA4U Philippine account held with the Metropolitan Bank and Trust.

In addition to reviewing the importation paperwork and declarations, USFWS agents and inspectors intercepted and covertly inspected five separate shipments. Upon inspection, these intercepted shipments were to found to contain Native American-style jewelry consistent with what agents have observed for sale and purchased as genuine Native American jewelry at retail stores across New Mexico. In some instances the jewelry was covertly marked by USFWS agents with ultraviolet-visible ink for later identification. Based on the results of those inspections and SA Stanford's review of all Sterling's USFWS import declarations, SA Stanford inferred that all of the import declarations claim similar products consistent with the importation of Native American-style jewelry.

The inspection of Sterling's FA4U imports also revealed another important fact. Not a single piece of jewelry was indelibly marked with its country of origin as required by law. *See* 19 U.S.C. §1304; 19 C.F.R. § 134.43. In fact, all of the imported jewelry inspected by USFWS, which was indelibly stamped with various initials and Native American-style symbols, was placed inside plastic bags outfitted with "Made in Philippines" decals. Without an indelible marking, the jewelry can be easily separated from the plastic bags to make it impossible for an unsuspecting consumer to determine the jewelry's country of origin.

SA Stanford's financial investigation of Sterling uncovered dozens of retail stores purchasing the Filipino-made, Native American-style jewelry. Moreover, an analysis of Sterling's bank account by an FBI financial analyst concludes that the majority of the 9.3 million dollars that has flowed into Sterling's account from October 1, 2010 to July 31, 2014 is directly related to the sale of jewelry. Naturally, SA Stanford visited many of those retail stores to determine how the jewelry was being sold to the public. SA Stanford covertly recorded and documented over a dozen purchases of the FA4U jewelry, which were being misrepresented as Native-American jewelry, at nine retail stores, including three of Nael Ali's stores. One of SA Stanford purchases from an Ali-owned store included the recovery of a piece of jewelry that was covertly marked with ultraviolet-visible ink during a USFWS import inspection.

### III.    Overview of the Sterling Islands, Inc. Supply Chain

The case against Defendant Mohammad Manasra relates to the investigation of Sterling, as well as I.J. Wholesale, Inc. ("IJW"), detailed further below. Sterling worked in concert with

Filipino corporation FA4U to design, import, and supply Sterling's Filipino-made jewelry to jewelry stores across New Mexico that would fraudulently sell the jewelry as Native American-made in violation of the Indian Arts and Crafts Act ("IACA"), 18 U.S.C. § 1159. Since 2010, Sterling imported approximately 11 million dollars' worth of Native American-style jewelry manufactured by FA4U. The 11 million dollars is the declared value of FA4U's imports from nearly 300 separate shipments into the United States. The Sterling supply chain is represented by the diagram on the following page.



## IV.    *The Case Against Defendant Mohammad Manasra*

Mr. Manasra served as both a retailer and wholesaler of Sterling's counterfeit jewelry. Mr. Manasra operated from the Albuquerque flea market but represented himself as a mobile nationwide wholesaler of Native American jewelry from his cargo van. Mr. Manasra admitted to

selling Sterling-imported jewelry at the Albuquerque Flea Market for many years.  He claims to have sold jewelry at the flea market and in Santa Fe for over twenty years.

### A.  Financial Investigation

An examination of financial records, from January 2011 to October 2014, reveal over $70,000 in payments from Ali's stores to Mohammad Manasra. Several similar payments were also made to Manasra's brother, Abdel Manasra over the same time period. After multiple debriefs, the United States determined that Manasra profited very little from his arrangement with Sterling Islands. He was not much more than a glorified runner, purchasing Sterling jewelry not much cheaper than his ultimate sales price to Nael Ali.

### B.  October 19, 2014—Undercover Buy with Mohammad Manasra at Albuquerque Flea Market

SA Stanford attended the Albuquerque Flea Market on October 19, 2014, and located a man subject selling jewelry consistent with Sterling's imports, who identified himself as "…Mohammad".  SA Stanford later identified the man through DMV registration records and photographs, as Mohammad Manasra. SA Stanford recognized several of the pieces sold by Manasra by their overall design, markings, and stamped initials, as consistent with Sterling imported jewelry. Manasra had displayed and offered for sale well over $1,000 worth of jewelry consistent with Sterling imports. SA Stanford estimates that the extrapolated



value of all the jewelry Manasra displays for sale at the flea market would be in the tens of thousands of dollars as he observed hundreds of jewelry pieces offered for sale at his booth.

During the covert contact, Manasra told SA Stanford that he was a Native American-jewelry wholesaler and had been in the business for over twenty years. Manasra claimed all of the jewelry on display was Native American made. Manasra also represented that he obtained all his jewelry from Gallup, NM. Manasra showed SA Stanford his cargo van that contained boxes of jewelry in distinct packaging that SA Stanford recognized to be consistent with that imported by Sterling.

Ultimately, SA Stanford purchased five pieces of jewelry for $500 that Manasra claimed to be Native American made. All of the purchased jewelry was consistent with that imported by



Sterling Islands. And later SA Stanford compared and matched the pieces to inspection photographs. Furthermore, one of the pieces had a "Made in Philippines" decal attached to it. Manasra even represented that piece to be Native American-made.

### V.    Assessing Defendant's Sentence

Subsection 3553(a) of Title 18 identifies a litany of factors to be considered in imposing sentence:

> The court, in determining the particular sentence to be imposed, shall consider—
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B) to afford adequate deterrence to criminal conduct;
>
>   (C) to protect the public from further crimes of the defendant; and
>
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . ;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

### A.   The Kinds of Sentences Available and the Sentencing Range Established

The statutorily authorized penalties for the one-count Information to which Manasra pleaded guilty include: a term of imprisonment for a period of not more than 1 year; a fine not to exceed $25,000; a term of supervised release of not more than one year to follow any term of imprisonment; and a special penalty assessment of $25. As the PSR writer has calculated, the Sentencing Guidelines recommend Manasra serve a term of incarceration within the range of 0 to 6 months.

### B.   The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

The crime of conviction in this matter, a misdemeanor violation of the Indian Arts and Crafts Act, in violation of 18 U.S.C. § 1159, targets Manasra's pattern of fraud at the flea market, as well as his supply of Sterling jewelry to several retailers. In comparison with the other players in the industry, Manasra's sales from his van at the flea market are at the lowest level. Manasra did not operate a business or company. He had no employees. He did not operate from a brick and mortar store. And his transport of jewelry from Sterling Islands to retail stores—that knew full well the foreign origin of the jewelry—did not amount to much more than delivery services. To be sure, Manasra misrepresented Sterling's jewelry as genuine Indian made at the flea market. And in that manner, Manasra's crime has negatively impacted genuine Indian artisans. His conduct formed part, albeit a small one, of a fraudulent industry designed to steal the cultural heritage of Native Americans for profit.

### C.  The History and Characteristics of the Defendant

Defendant Manasra is 58 years old. He is married with five children under the age of 14

years. PSR at 3, ¶ 82. He reports a good childhood. PSR ¶ 113. He did not report exposure to any

abuse or violence during his formative years. *Id.* Manasra immigrated to the United States at 23

years of age. He never continued his education past the 6th grade. From 2013 to 2016, Manasra's

tax records reflect an annual income between $27,000 and 15,000, which is significantly beneath

the federal poverty level for a family of seven. Manasra reportedly still works out of his van at

the flea market.

Manasra's familial situation does not warrant a variance in this case. Family

circumstances are a discouraged factor under the guidelines, *see United States v. McClatchey*,

316 F.3d 1122, 1130 (10th Cir. 2003), and "are not ordinarily relevant in determining whether a

sentence should be outside the applicable guideline range." USSG § 5H1.6. Congress

specifically directed the Sentencing Commission to "assure that the guidelines and policy

statements, in recommending a term of imprisonment or length of a term of imprisonment,

reflect the general inappropriateness of considering the education, vocational skills, employment

record, family ties and responsibilities, and community ties of the defendant." 28 U.S.C. §

994(e); *see* USSG § 5H1.2 (policy statement) ("Educational and vocational skills are not

ordinarily relevant in determining whether a sentence should be outside the applicable guideline

range ...."); *id*. at § 5H1.5 (policy statement) ("Employment record is not ordinarily relevant in

determining whether a sentence should be outside the applicable guideline range."); *id*. at §

5H1.6 (policy statement) ("Family ties and responsibilities are not ordinarily relevant in

determining whether a departure may be warranted."); *id*. at § 5H1.11 (policy statement)

("Military, civic, charitable, or public service; employment-related contributions; and similar

prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.").

Under the law, Manasra's upbringing and family bonds do not excuse or explain his criminal actions. Unlike many defendants, Manasra was raised in a supportive household, he was not abused, and he did not become addicted to drugs. And yet, he chose to engage in long-term fraud, violate the laws of the United States, cheat his customers with lies and deception, and steal the cultural heritage of Native Americans for his own profit.

### D.  The Need to Avoid Unwarranted Sentence Disparities

The United States asks for nothing more than for the Court to treat similarly situated defendants similarly. Fidelity to the guidelines is the most fair and transparent means of accomplishing the worthy end of consistent sentencing.

As this Court is well aware, the Sentencing Guidelines are advisory. *United States v. Booker*, 543 U.S. 220, 234 (2005). Taking into account the provisions of 18 U.S.C. § 3553, a reasonable sentence under *Booker* is one that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence to criminal conduct, protects the public from further crimes of the defendant and provides the defendant with needed educational or vocational training, medical care or other correctional treatment.  18 U.S.C. § 3553(a)(2)(A), (B), (C), (D); *Booker*, 543 U.S. at 261-62.  A reasonable sentence also is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6). Section 3553(a) continues to require sentencing judges to consider certain factors when imposing sentence, including "the kinds of sentence and the sentencing range established" by the Guidelines.  18 U.S.C. § 3553(a)(4). While no presumption of reasonableness attaches to a Guideline sentence in this

Court, this Court may conclude that a Guideline sentence is a "rough approximation" of a sentence that would achieve the sentencing factors set forth in 18 U.S.C. § 3553(a)'s objectives. *United States v. Rita*, 551 U.S. 338, 350 (2007).

Based on Manasra's relative culpability, his guideline range is reasonable. Manasra did not endeavor to manufacture fake Indian jewelry oversees. And he did not build businesses to deceive the general public. In fact, he barely subsisted from his work at the flea market. He did, however, violate the Indian Arts and Crafts Act by selling products he knew were not made by Indians as if they were. For that crime, the Sentencing Commission recommends that Manasra serve 0-6 months. Manasra has already spent two days in jail. He is now apparently on the precipice of bankruptcy. Based on those facts, as well as Manasra's willing cooperation, the United States asks this Court to impose a sentence of time served, which is near the low-end of the guidelines range, followed by 12 months of supervised release.

## VI.    CONCLUSION

Based upon the aforementioned authorities and arguments, the United States requests that this Court accept the presentence report's calculations. The United States also requests that this Court sentence Defendant Manasra at the low-end of the guideline range to a time-served sentence. A variance from the Sentencing Guidelines sentencing range in this case would not send a sufficient message of deterrence, would not safeguard our Native American communities, would not promote respect for the law, or provide a just punishment for Manasra's offense. Conversely, a sentence of time-served, along with 12 months of supervised release, at the low end of the guideline range, would be consistent with all of the considerations delineated in § 3553(a) and would be sufficient, but not greater than necessary, to accomplish the objectives set forth in that statute.

RESPECTFULLY SUBMITTED this 4th day of May 2018.

JOHN C. ANDERSON,
United States Attorney


_____/s/_____

Kristopher N. Houghton and
Sean J. Sullivan
Assistant United States Attorneys
United States Attorney's Office
201 Third NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274


CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2018, I filed the foregoing document electronically through the CM/ECF system.  Pursuant to the CM/ECF Administrative Procedures Manual, §§ 1(a), 7(b)(2), such filing is the equivalent of service on parties of record.


_____/s/_____

Kristopher N. Houghton
Assistant United States Attorney

11